Good morning. Welcome to the 9th Circuit via video. The case that we're arguing this afternoon is National Family Farm Coalition v. US Environmental Protection Agency and Monsanto. If any of you are standing, you are welcome to sit down. The argument first with petitioners, I have the time with 10 minutes and 10 minutes. Is that correct? That's correct, Your Honor. And good afternoon. Good afternoon. I'll have you make your appearances in a moment, but I just want to get the timing correct. In doing that, of the 20 minutes total, what amount are you saving for rebuttal? So we like to speak for seven and a half minutes each and save five minutes for rebuttal. And are you splitting the rebuttal as well? That is our plan, but we're making adjustments depending on how the discussion goes, but yes. All right. All right. So we have counsel make their appearances, please. Good afternoon, Your Honors. My name is Sylvia Wu. I'm here on behalf of petitioners. Good afternoon, Your Honor. George Kimbrell on behalf of the petitioners. You may proceed. Good afternoon, Your Honors. I'm here. I will be addressing the court on our petitioners' IFRA claims while my colleague George Kimbrell will address the ESA claims. We're here today to discuss the third iteration of EPA's approval of dicamba pesticides for over 100 years. This is one of the top uses on genetically engineered soybean and cotton throughout their growing seasons. EPA extended these registrations despite two catastrophic seasons that saw dicamba drift damaging nearly 5 million acres in soybean alone, not to mention countless acres of specialty crops, fruits and vegetables, and ornamental plants, as well as putting at risk hundreds of endangered species in their critical habitats. Was this pre-emergent? The data, the record shows that most of the dicamba drift damages were over the top or post-emergent, so later in the season. I point the court to ER-12, where it shows a bar graph that indicates a significant increase in dicamba drift damage since the registration approval in the 2017 and 2018 growing season. EPA itself also said that the reported incidence of dicamba damage increased steadily throughout the season, with the most of them happening in late June, July, and August. By definition, this would be post-emergent? Yes, because the earlier pre-emergent, pre-spring usually happens in April or May, whereas by late summer, these are all post-emergent uses. EPA's registration extension still fails to comply with FFRA. We detail numerous reasons in our briefs, and I'd like to focus my time today on EPA's failure to support, with substantial evidence, the two statutorily required findings before conditionally extending these registrations. Now, under FFRA, EPA is required to show that it had satisfactory data pertaining specific to these post-emergent over-the-top uses. EPA's own regulation states that, quote, at a minimum, EPA needed data to, quote, characterize any incremental risk. The record shows that EPA did not have such data. In fact, in the registration decision document, EPA noted that at the end, at its third iteration of registration extension, that there was still, quote, uncertainty associated with existing databases for over-the-top uses, not all uses of Dicamba, but specifically for these over-the-top uses. Indeed, EPA admitted that it didn't even have enough information to support its regulatory decision through the two-year term period of its current registration extension. EPA extended these registrations until December of this year, December 2020, yet EPA noted in the registration that it still needed to, quote, as the basis of making an informed regulatory decision regarding any future uses of Dicamba beyond the 2019 growing season, which is obviously at this point behind us. And this is because despite the fact that EPA had reviewed volatility and various plant effect studies, those studies were deficient in numerous ways and failed to provide EPA with satisfactory information on for example, at ER 378, that despite all its studies, it didn't have a single study that measured the effect of Dicamba drift and its effect on soybean yield. And EPA also noted of the studies that it had that measure harm in terms of plant height, that it only had four such studies, such that EPA stated, quote, as such, there is statistical uncertainty in whether this limited number of studies is sufficiently robust enough. Most tellingly, EPA is still calling for more studies as in under the current terms of the regulation. EPA called them confirmatory studies, but for them to be confirmatory, there will have to be something in the rate record for them to confirm. These are not the type of study that confirms anything. In fact, EPA is calling for the first time a non-target plant effect study that would measure harm both in terms of yield and height, and also across all directions from the treated field. EPA doesn't have a study that measure all these effects to this date. So let me understand, Ms. Wu, let me understand your position. And that is your view that confirmatory studies that are being requested are actually original data that was not supplied in the first place? That's correct. EPA doesn't have any study, I was about to go on, on trees and shrubs, for example. EPA is asking for a study on studying the effects of dicamba drip on trees and shrubs. EPA stated, quote, these type of plant growth and life histories are not represented by the data submitted as part of the registration data. They don't say we have some, we would like to confirm it. They said they're not represented, and that's at ER 19. So without study effects of studies on, say, effects on trees and shrubs, which the record shows there were numerous incident reports of harm in the real world in the past two growing seasons to trees and orchards, EPA doesn't have enough information to characterize the incremental risks from these pesticide registration extensions, which EPA's own regulation and FFRA statute requires. I'd like to move on to the second factor. EPA was also required to find that the registration would not significantly increase the risk of any unreasonable adverse effect on the environment. This is usually considered a risk benefit analysis under FFRA. Here, EPA's conclusion fails to, can't be supported with substantial evidence when considered on the record as a whole. First of all, the record indicates that EPA didn't determine the level of dicamba drift in the last two growing seasons to be acceptable or reasonable. EPA described the number of incidents in 2017 and 2018 as, quote, a record number of complaints. This is at ER 475. Indeed, EPA took actions in this current registration extension to, quote, further minimize offsite movement. EPA still thought there was room to reduce offsite movement. Yet EPA's conclusion at ER 18 was that, quote, when the requested mitigation measures for these uses are applied, the benefits of the use of the pesticide outweigh the risk. So EPA's entire finding of no significant increase of unreasonable adverse effect rests on the idea that its risk of adverse effect to a reasonable level. But there's no evidence in the record that the mitigation measures will do that. In fact, EPA itself characterized its latest label amendments as minimal at ER 20 as compared to the label's use instructions that were in effect in 2017. There's replete record evidence that EPA, that's from applicators and state regulators that told from the 2017 label that the level of off-target damage in 2018 remained unacceptable. Pollinator Stewardship Council teaches us that EPA must have at least a real idea of the unreasonable adverse effect of its pesticides. Under the current— Would you like to save your remaining time for rebuttal? Yes, I will. Thank you, Your Honors. Thank you. Good afternoon, and may it please the Court. George Kimbrell on behalf of the petitioners. EPA violated the Endangered Species Act a number of ways, but today I'm just going to focus on three. First, they applied an unlawful standard throughout their assessment. Second, they used that standard to improperly exclude hundreds of endangered species from the action area. And finally, the arbitrary 57-foot buffer that was put in place in limited areas. Now, the through line of EPA's violations of the ESA is this unlawful consultation standard. Section 7, called by this Court the heart of the ESA, has several steps, but the only one at issue in this case is the first and the lowest, the may affect threshold. If these pesticides may affect any endangered species or critical habitat, EPA must consult Fish and Wildlife Service. Now, this Court in the Karuk Tribe case defined that standard as any chance of any possible effect, whether beneficial, benign, adverse, or of undetermined character. And that Court was simply enshrining en banc what previous panels of this Court had said, as well as guidance from the wildlife agencies going back to the 1980s. Now, the critical question before the Court today is whether EPA can redefine the no effect standard to some effect, just not what they think is of concern. Now, they cannot. They applied an standard into the EPA context. Now, that standard looks at whether harm is unreasonable or not or adverse. It doesn't look for any possible effect. The ESA is very different, as this Court has explained in Washington Toxics and Elsewhere. It has an intentionally low threshold for consultation that has institutionalized caution as its mandate and gives the benefit of the doubt to species. Now, in light of that low threshold, it's worth reiterating the scope of this case. This case is not about one landowner applying a pesticide in their yard. It's about 100 million acres, 34 states, two major crops, and an increase of dicamba into the environment of 25 million pounds a year. That's 88 fold on soybean and 14 fold on cotton. EPA counted 587 endangered species originally in the action area and 216 critical habitats. And yet, it decided that that action could have absolutely no effect on any of those species whatsoever when it made its no effect determination. And they still doubled down on that in 2018, despite the drift evidence of 5 million acres of drift that we saw in the fields in the 2017 season and the 2018 season. Now, that was because they were looking through the wrong lens. The record shows that what the level of concern standard looks for is adverse effects. You can see that at ER 229, among other places. If EPA believes that effects below the level of concern are discountable or insignificant, that is the definition of a not likely to adversely affect decision, which is step two of the consultation standard and requires at least informal consultation and written consent from the Fish and Wildlife Service. They can't merge those steps. They cannot aggregate that authority just to themselves unilaterally. So, the LOC was too high, but it's also too narrow. It doesn't encapsulate the panoply of ways that pesticides can harm endangered species. It doesn't, for example, address behavioral effects like a bat's ability to echolocate or a bird's ability to migrate. It doesn't look at some lethal effects or the effects of the whole formula or mixtures of pesticides, like tank mixing of these pesticides with others. So, this BSA inquiry is a broader inquiry than what they applied, and that's arbitrary and capricious. They have failed to look at an important part of the problem. Importantly, EPA receives no deference when it's doing the BSA work. It has no special place in the statutory scheme, and in fact, its interpretations here are contrary to two of the regulations, the May Effect Regulation and the Actionary Regulation. Nor does it have any particular expertise in endangered species survival and recovery. In fact, it asked the National Academy of Sciences how to do this after struggling with it for years and disagreeing with the expert wildlife agencies about how to do it. They went to the National Academy and said, how do we do these pesticide consultations? The National Academy in 2013 issued a report and told them, the way you're doing it, this level of concern standard is, quote, not scientifically defensible. That was five years before this registration decision, and EPA used the same system here, the same approach. I'm sorry, Judge Fletcher, can you repeat your question? The report to Congress is in the record. The National Academy's not in the record. We cite it in our opening brief, page 49, but it's a government document that's judicially noticeable. Their report to Congress is in the record, at Respondent's Excerpts of Record 324 and 325, where EPA agrees that overlap with habitat, the way the National Academy said, should be a May Effect trigger, and that they agree to implement it from a day forward in 2014, yet they did not here. May Effect means any chance of any possible effect, not just those that EPA believes is, quote, of concern. With regards to the action area, in 2016, EPA limited it to just the fields themselves, because it said that the pesticides wouldn't leave the fields. In 2018, we know that they were grossly wrong about that decision, and that we have massive amounts of drift that did occur in those seasons, and yet, an overlap with species. Yet, in 2018, EPA made no changes to its assessments for the vast majority of species, just in ER 341, maintaining its determinations for those species. That's, again, because it applied the wrong standard to those species off-field, by saying that at ER 17, drift would only occur at levels that were, quote, below its thresholds, and that the label mitigation measures would, quote, limit drift below their risk triggers. Now, EPA cannot limit the action area to where they find no adverse effects. The services define the action area as all areas directly or indirectly affected, not just those areas EPA determines are affected at a level of concern. In fact, there are numerous may affect admissions in this record for hundreds of endangered species. You can see that at ER 336, among other places, where EPA says that endangered plants, animals, and birds cannot be excluded from potential direct or indirect risks, and other places as well. A few points about the 57-foot buffer. The first thing to remember about that buffer is that it only applies in 8% of the whole landmass that's applied here, and only for 69 plant species. For the remaining nearly over 500 species at issue, EPA did no new work. If you look at ER 341, and this is important, there's only one sentence where EPA addresses all the other species, and they say that the evidence, quote, suggests that exposures are insignificant to trigger their concerns. Again, they're applying the wrong standard, but more than that, there is no evidence in the record they did anything else for these other species. We gave an example in our brief of pollinators, insects and birds that rely on plants that EPA knows are going to get hit by drift now, and yet they did no further acceptance for them. Even for those 69 species, two points. First, they applied the wrong legal standard. They threw out all the evidence of visual harm hundreds of feet distant from the fields, and instead said we're only going to look at the studies that look at 5% reduction in height as tied to yield. Now, that's a different endpoint. That's not may affect any level of visual harm, however far from the field should have triggered the duty to consult. It's also contrary to the record. Their own scientists said a defensible buffer should have been 443 feet from the field. That's an ER 525, and I will reserve my time. Thank you, Mr. Kimbrough. Now, with respect to the government, if you can explain how you have decided to divide your time, I see on the sheet that we would have six minutes for Ms. Buckley, six minutes for Mr. Grosko, and eight minutes for Mr. Bress. Is that correct? That's correct, Your Honor. This is Sarah Buckley on behalf of EPA. You may proceed, Ms. Buckley. May it please the Court, I will be presenting for the first six minutes on the FIFRA issues, and my colleague Mr. Grosko will address the ESA issues for EPA. This case is fundamentally about EPA's application of its scientific expertise to make a judgment call in the face of scientific uncertainty. I'd like to address two primary points. First, that EPA's scientific assessment of Expendamax's risks and the mitigation measures that would be appropriate to address those risks was reasonable and supported by substantial evidence. And second, that EPA's assessment of Expendamax's benefits and impact, and thus its ultimate conclusion that the registration will not present unreasonable adverse effects, was supported by substantial evidence. May I ask you, before you launch into your argument, will you include discussion of the label issue in that argument? Yes, Your Honor, and I'd be happy to address that here. I think that the fundamental point on the label is that EPA selected label restrictions and other restrictions in this registration that can address multiple routes of exposure. These include things like label misuse by ensuring that this product will only be applied by certified applicators, those who are the most experienced and most highly trained and able to read the label and apply it correctly. And second, by having those applicators take the CANVA-specific screening to familiarize themselves with this label. The label restrictions also address other factors that may have contributed to the incidents reported, such as applications during temperature inversions. It limits the number of applications during the season. It puts a cutoff time that on soy products, you can only apply 45 days after planting, on cotton 60 days after. Excuse me for interrupting. This is Judge Fletcher, and your time is running, and I want to make sure to get this question in. I'm on page ER11, and the question is addressed by the EPA as to whether or not the reports of incidents is underreported or overreported. And I'm just reading from what the EPA writes. According to the AAPCO, university researchers, and some growers, the number of cases reported in state And then the EPA writes, others believe there may be issues of overreporting. Do you know who those others are? Well, your honor, there are a number of comments that were submitted by interested parties. There is one document in the record, one of the registrants submitted, that addressed reasons why there would be overreporting as well as underreporting. But both of these factors go to the unsearched. Can you point me to that in the record? The reason I ask it this way is the only citation the EPA gives them when they say others is to report by Monsanto itself. And Monsanto suggests, or doesn't quite say, that it's overreported. And I was unable to find anything what the EPA tells me as to who those others might be in addition to Monsanto. Can you tell me who they are or who they might be? Not off the top of my head, your honor. The citation I was going to point you to was to the white paper submitted by Monsanto, but we'd be happy to supply you with additional citations to comment. I read the white paper and there's the only entity saying that they're overreporting is Monsanto. Well, we can address additional comments and supplemental filing with the court if you wish, your honor. But both of these points get to the fundamental uncertainty that EPA identified with the reports from 2017 and 2018. And the agency concluded that there was not a scientific consensus either on the causes of various incidents besides the general consensus that, one, there were some which some commenters believe to be volatility. Those conclusions EPA addressed in its scientific assessment of volatility where it reconfirmed its prior assessment that volatility would not in and of itself cause adverse effects off the field. This was a conclusion confirmed both by Monsanto submitted studies and by independent studies by academic researchers. Another element of uncertainty. Excuse me, I'm sorry, we're having trouble with the over-talking and it's not your fault. But I'm not sure I can call them studies, but certainly the reports from the field and there are lots of them during the 2018 growing season after the change of the label are huge amounts of off-field damage. So the studies may say one thing and the studies conducted by Monsanto are a very limited field size. But if we can call them real-world experiences, quite to the contrary. Well, I would point your honor to the academic studies which were conducted on larger acreages of field and also concluded that one, volatility would not be a sole cause of off-field effects. Two, that spray drift would not be a sole cause, but that combination of exposures, perhaps volatility, spray drift, or other exposures that these field style studies could capture would cause only minimal effects off the field. I see that my time is expiring, your honors. I just want to finish. I have another question if you don't mind. Please, your honor. And that is in the Monsanto white paper and then in your brief you, I think relying on them, suggest that one of the reasons, maybe even the primary reason for these reports is that dicamba is being used on corn. But the problem with that, and Monsanto kind of recognizes this, the uses on corn have been consistent over time and they were the same before and after. Monsanto goes out and Illinois studies a lot of fields where they're getting complaints and they keep locating nearby corn. But as far as I can tell, Monsanto never asked any of the operators on the corn fields as to whether they had changed their habits. What's your response to that? It seems to me that the corn hypothesis is just a hypothesis and Monsanto could have obtained evidence to support the hypothesis, but did not. Well, your honor, yes, there are reports in the record, as you described, that a one potential cause could have been the application of more volatile dicamba formulations on top of corn or on top of other crops. And I think this gets a little bit to Judge Hawkins' question earlier, that yes, these incidents are... Do you say the reports in the record or is it just speculation by Monsanto? Well, your honor, I guess I would have my friend Mr. Bress address the methodologies that Monsanto applied in its field studies, things that it reported to EPA, but that was one piece of evidence. Other pieces of evidence were that there could have been illegal applications of non... The dicamba formulations that were not registered in this action, other dicamba formulations that were more volatile over crops, over the top. So even though they were pre-plant formulations, they were applied over the top. There were also extensive reports of label misuse that is applying these over the top products in a way, a manner inconsistent with the label restrictions that EPA specifically designed as a strong precautionary measure to be what is necessary to help keep this product on the field. Well, what about the contrary allegations, which is you're saying that the label is designed with such specificity as to make sure that there's not misuse, but there's a lot of evidence in the record that you can't follow the label even, that as a practical consequence, following the label is a non sequitur. And I would appreciate EPA's response to those comments. Yes, your honor. There are a couple of pieces of contrary evidence in the record showing that you can, in fact, apply this product consistent with the label in that both Monsanto's studies and the academic researchers' studies applied Xtendimax and often a tank mix of Xtendimax and glyphosate, which petitioners contend would cause it to volatilize. They applied those consistent with the label requirements, and we saw that when applied consistent with the label requirements, you had no effects from volatility alone and minimal effects from a combination of exclude groups. Thank you. Unless my colleagues have further questions? Thank you, your honor. Thank you. I guess we'll now go to Mr. Grosko, is that correct? Mr. Grosko, may it please the court? I'd like to address two topics today. The first is that the petitioners are distorting the EPA's levels of concern and risk quotient methodology to suggest that somehow at the first screening level analysis, EPA made may affect determinations. That's not accurate. The screening level analysis does not seek to make no effect or may affect determinations. It merely allows EPA to exclude those taxa that are of no concern and do not require further analysis. The second point is that the Fish and Wildlife Service and the National Marine Fisheries Service have endorsed this level of concern and risk quotient methodology. Judge Fletcher, you referred to a 2014 interim report to Congress. At ER 340 and ER 342, it makes clear that these services have endorsed and put their intermoder, in fact, on this methodology. So my points are at first that the EPA has effectively implemented the ESA, okay? The it uses a scientifically valid methodology. And as I said, there are two different phases. Now, notably, the petitioners at 1336, the Center for Biological Diversity, suggests that EPA should use a no act, no observed adverse environmental effect concentration, or a one in a million chance of effect. They call this a negligible risk standard. So it's essentially the same principle, but they just don't like the exact levels of concern that EPA used, or perhaps they don't like that this pesticide ultimately was registered. Also, the petitioners do not have a problem with the use of the levels of concern and risk quotient at the screening level analysis. They only have a problem with it when EPA gets to the second level of analysis. That's the first point, Your Honor. Number two, is that the Fish and Wildlife Administration has full knowledge of this methodology. As I mentioned, the 2014 interim report to Congress states that this methodology would be protective of listed species. It would involve conservative assumptions. And the EPA would be focusing on those areas where it could make no effect. That's exactly what EPA did here. So they've been fully aware of how EPA was going to handle another and the vast majority of pesticides. And in short, this means that the EPA used the best available science. What we've got is a situation where the petitioners would prefer that EPA use something other than the best available science. In the few minutes that are left, I'd like to quickly touch on the 57-foot buffer. EPA put together a comprehensive assessment in its 2018 decision. It looked not only at the studies that were still there from 2016, field studies, humidome studies, but also an additional humidome study that had come to light, and a number of academic studies that had come to have been published also in the interim. EPA had to look at reliability and had to look at comparability, had to look at consistency with these studies, had to make judgment calls when weighing the best available science. It then had to relate the data points that came out of those studies to what are called apical endpoints. The apical endpoints, again, it's an agreed methodology with the Fish and Wildlife Service going back a number of years. You look to ER 395 and ER 341, even the National Academy of Sciences has endorsed the concept of apical endpoints for looking at possible effects to plants. This is Judge Fletcher. The 57-foot buffer within the field that's being treated seems to me, in fact the record very clearly indicates, does not tell us where the dicamba ends up because we have such strong evidence both of spray drift and volatility drift. So it seems to me I have trouble understanding why 57 feet is a magic number. I can get some of the applicator testimony or evidence in the record that with respect to crop damage, let alone ESA, that they're staying a quarter of a mile away from the edge of the field. 57 feet is nothing. How do you respond to the fact that we know that a great deal of this dicamba is ending up off the field that's being treated? Yes, your honor. EPA did take into account the reports that came in and in fact that was what triggered the analysis that took place at the new information document. I would point your honor's attention to ER 322 at SAC and especially ER 418 and 417 and 77 and 378. I'd like to explain and try and unpack for you in the short amount of time I have remaining what EPA did. EPA compiled about 25 studies there. You'll look at, it ultimately chose to relate the ethical endpoints to the five percent reduction in height. It decided that that was the appropriate measure because ESI had problems with being inherently subjective and it relied on the studies that you see in the ninth column from left to right. You'll see also at 377 a simulation of a probability distribution program that EPA used to increase its confidence in that available data and arrived at the conclusion that for extenda max the potential for a drift would be 7.47 meters or about 22 feet. That's well under the 57 foot buffer. Just in closing, your honors, the Friends of the Santa Clara River case really does establish that EPA has the latitude to determine what is the best available time and we would urge the court to reaffirm that principle here and defer to the EPA. We would ask that the court uphold the no petition. Thank you. We'll now hear from Mr. Bress. We're not hearing Mr. Bress. There's probably a magic button somewhere that says. Are you hearing me now? Yes. Yes. Do you hear me now? Awesome. Thank you. Yes, we hear you now. Great. Great. All right. Well, may it please the court, I'd like to address today primarily jurisdiction and remedies if I may. As to jurisdiction, I didn't expect 18 months ago that I'd be back before this court talking about jurisdiction again. But petitioners once again waited more than 70 days after the order, registration order was entered in order to file their petition for review. That's 60 days is the jurisdictional limit. So they're jurisdictionally out of time. The facts are not really in dispute The notice of registration is the operative document. It was issued November 1st of 2018 and it stated that the pesticide was hereby registered. It also provided immediate authority to relabel items that were already in commerce and therefore was immediately affected. That's not in any doubt in this case. It's not disputed. Petitioners admitted on page two of their reply brief to our brief and the United States admitted on page three of its response to the motion in the enlist case. So that leaves us with two questions. You know, I'm having terrible trouble hearing somebody rustling papers and your voice is I'll try to speak slowly. Is this working? Yeah, you're a little better. Yes. Maybe we could ask those that are not speaking to mute their mic. Yeah, I think that the court does that automatically. Okay. Okay. Thank you. I'm not going to back up. If you want to back up a little, that's fine. But you were talking about. Yes. So where we left off and we could hear you pretty clearly was you were explaining when the order was issued and would take an effect and then you may proceed from there. Thank you. So the order took effect on November 1st, 2018. That was admitted by two of their reply to Monsanto and was admitted by the United States on page three of its response to the motion to dismiss for lack of jurisdiction in the enlist case. It's not in dispute. So the two questions before this court are questions of law. Number one, did Congress give EPA authority to defer the reviewability of its orders for two weeks beyond their effective date? Number two, did EPA exercise that authority? For there to be jurisdiction, the answer to both questions has to be yes. But the answer to both questions is no. Let me start with the statute 136NB. In reading statutes like this, the courts, including your court, have a strong presumption that Congress does not intend to preclude the review of rules that are effective. In other words, that impose obligations or extend rights unless Congress speaks clearly. Nothing in this statute speaks clearly to tell EPA they can create a two-week period where there is no review. This case is distinguishable from the only case cited by petitioners, which is the Western Union case in the D.C. Circuit. In that case, as then-Judge Scalia explained, the Federal Communications Act provided expressly that jurisdiction would not start until there was no notice given of the agency's rule. And therefore, as Justice Scalia explained in that case, Congress itself provided for a delay in review after the effective date. The statute here doesn't do that because Congress didn't authorize EPA to defer review of effective orders. The order here was jurisdictionally out of time, regardless of what the agency thinks. But if we look at what the agency thinks, you come to the same result. The rule at issue here, 23.6, provides that an order is entered 14 days after it is signed unless EPA explicitly provides otherwise. EPA did explicitly provide otherwise in this case by making its order effective immediately. Now, in that rulemaking, EPA itself equated effectiveness with entry, and it addressed the specific issue that's effective immediately. And what it said is, if we make an order effective immediately, it is entered immediately for purposes of our rule, and the clock starts immediately. There really isn't any doubt about any of these propositions, Your Honor, and there is no jurisdiction. If this Court, however, finds jurisdiction, and if this Court finds that EPA erred in any respect, it should resist the petitioner's call for an immediate national vacater, at least not without supplemental briefing, Your Honor. Planting has already started. If this Court were to vacate in the middle of planting season, it would cause chaos not just for farmers, but it would also cause great risk for endangered species and the environment. And none of that is necessary. What would be the risk to the endangered species if there were an order? Yes, Your Honor, the risk to endangered species is that farmers would scramble and many would undoubtedly choose other pesticides to use in the middle of the growing season. Aside from dicamba, no other pesticides at EPA have gone through this comparable level of review under the Endangered Species Act. They don't have the same buffer zones. They don't have the same conditions on use. So we'd be trading a pesticide that we know what the effects are and understand them for ones where the same level of analysis has never been done. Now, petitioners throw out a We looked up the pesticides in that citation. They're largely for pre-emergence use, and most departments burn down. They're not pesticides that are usable for these purposes. In other words, you're saying the growers would misuse the pesticides? No, no, no, Your Honor. They're authorized for these purposes. They're just not usable. In other words, the growers wouldn't use those. They would use other pesticides, including the ones that EPA describes in its benefits and impacts state. There, EPA discusses alternative pesticides. To cotton, EPA finds that the only alternatives that can also address pesticide-resistant weeds are the other herbicides that are used with herbicide-resistant crops. Those can't be used mid-season because the seeds that the farmers will have planted are only resistant to dicamba. They're not resistant to 2,4-D. They're not resistant to glufosinate or dicor. For soybeans, there are some other alternatives, but those other alternatives are not equally effective when used over the top. Farmers may use them. Those include some that are undoubtedly more toxic than dicamba and don't come with the same conditions on use. They're legal to use, but they can cause more harm to the environment. What we respectfully request, Your Honors, is we can't address what the more narrow, better remedies might be without knowing more about what this court decides. But once this court has in mind what it thinks, if it reaches the merits and find there's error, expedited briefing on remedies would allow us to discuss issues such as if this court were to find that endangered plants are an issue. Right now, we know that those are only in 218 counties out of the 2,000 counties where cotton and soybeans are planted for this use. A nationwide vacater would eliminate farmers' ability to use this herbicide in all of the other counties because even in the counties that are implicated, larger buffers could be used. The same goes largely for endangered animals. I don't think very many of those are an issue. In fact, most of them aren't anywhere near these farms. The only one that is even worth discussing, I believe, is probably the carnivorous butterfly. That's one that may exist near where these farms are, but the argument the petitioners make that it relies on the wild dupine and indirectly could by effects on the wild dupine doesn't get petitioners very far because there's no evidence that the wild dupine exists in areas where these farms are. Thank you. You've extended your time, and so if you would wrap up, we would appreciate it. We'll do your honor and thank you for your work forbearance. Thank you. Not a problem at all. Thank you. We'll now go to the rebuttal for the petitioners. Good afternoon again, your honors. Quickly on jurisdiction, EPA's own regulation makes it very clear that for purpose of judicial review under FFRA, the regulation is effective for review two weeks after it is signed unless the administrator otherwise explicitly provides in a different order. There's no such explicitly other order here. EPA has consistently agreed with our interpretation of the timing of jurisdiction, and courts have held that, quote, it is not a principle of law that all agency actions must be similar jurisdictional regulations of the statutes that it administers. Therefore, the petition for review was timely. In other words, you're saying that the effective date order or portion of the order has no impact on the jurisdiction? No, that's part of EPA's regular practice. EPA signs the order, and EPA has agreed with us in the predecessor of this case as well as the enlist dual case that for purpose of judicial review, the two-week period applied in exactly the same fact pattern. That's not my question. My question is whether it's your position that the order which says the effective date is immediately, that that doesn't have an impact on jurisdiction. Is that your position? Our position, if I'm understanding your question correctly, is that the application of the regulation for the CFR 23.6 means that the date for judicial review, the clock for judicial review, starts two weeks after that accepted date on the notice of registration. That's your position, but I don't think you've really answered my question with respect to the order. We'll go back and take a look at that. Please proceed. Sure. I'd just like to note that EPA has agreed with that interpretation in both the prior second case and enlist. Thank you. You've exceeded your time, but I'll give you another minute so you can wrap up. It's very hard to split such tiny rebuttal time in two. I appreciate that. Thank you. I appreciate that. We'll try to accommodate that. We'll give you another minute, please. I appreciate that, Judge McEwen. Under FFRA, EPA has to have substantial evidence that there's no unreasonable adverse effect. It doesn't have to find no adverse effect, but it needs to make sure that the adverse effect level is reasonable. EPA needs to do that with some data. In the face of real-world evidence of catastrophic harm for the two season, EPA has failed to do so here on the basis of inconclusive data and on the basis of the lack of any assessment as to the efficacy of its mitigation measures. For these reasons, we ask that the court vacate the registrations. Thank you. Thank you. Just a few points. I'll start with the remedy question raised by Monsanto. There is absolutely no record evidence that there would be worse for the environment, that it is not more environmentally safe to vacate the pesticide registration. It's absolutely vital that the court do that. It's very simple. Without vocator, there's going to be 25 million pounds of dicamba that's going to be sprayed over the tops and out into the environment. With vocator, that doesn't happen. Very clear what the safer alternative is to that. Farmers can use pre-emergent versions of this as they had for many years before 2016 when these were registered. There's also less toxic versions. We cite those in our brief. So the burden here was on the respondents, and there is no evidence in support of the post hoc statement of Mr. Bress with regards to the environmentally safe outcome. It is not the court's job nor our job to try to cut up vocator. It is a remedy that is a status quo ante. It sends it back to the agency. We shouldn't be asked to do, or the court shouldn't be asked to do, the same analysis that the expert agency needs to be done during consultation. So that's what happens after vocator. The California Regent's case, among others from this court, support that conclusion. Absolutely, your honors, we have briefed this. They have had their opportunity to brief it two times now. They shouldn't get another chance to brief it when they haven't met their burden. With regards to the merits, very quickly I will just say, well, the conservative thing, despite how Mr. Grosko frames it, is to consult. And however EPA wants to couch those may affect admissions, they are textual admissions like the ones in Karuk tribes. So there is no case like this case that signs off on a no effect determination of magnitude or using this level of concern method because the proper standard mandates consultation. This may affect standard has to be kept sufficiently low, that's what the court said in Karuk tribe, in order to ensure that agencies ensure that endangered species are not jeopardized. That's why the may affect standard is where it is. The Friends of Santa Clara case that was mentioned is very different than this case. In that case you had water that was being deposited into a river that had a copper concentration that was already below the background levels of copper that were in that river. It diluted the copper in that river, which actually lowered the risk for endangered species. That's the opposite of what we have here with an increase of 25 million pounds of dicamba onto these fields. And the congressional report, one more point, if I may. Fish and Wildlife Service absolutely has not endorsed what EPA has done here. Even if they did, the legal standard is still the legal standard. But if you look at that congressional report, it says what EPA intends to do. What's important about that report is that EPA admits there that our position and the National Academy of Sciences position about what may affect is and if there's overlap, they have to consult. That's their position that they've taken other places. That's why that report is important. EPA itself has agreed. They just refused to do it in this instance, despite that report being five years before this registration, even though in that report they say we're going to apply this from a day forward. Well, it's been five years forward. They haven't applied it. For these reasons, we ask that this court vacate the registration and do so before the planting season. Thank you. Thank you. Thank you to all counsel, both for the very extensive briefing and your person in San Francisco. We've been able to really have very effective arguments today, so I appreciate all of you for accommodating that and the judges as well. The case of National Family Farm Coalition versus the EPA et al is submitted and we're adjourned. Thank you.
judges: Hawkins, McKeown, W. Fletcher